1

2

3

4

5

6 **IN THE UNITED STATES DISTRICT COURT**

7 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9 STEVEN L. SEALES,                                    )       Case No. 1:07-cv-01384-TAG
                                                       )
10                          Plaintiff,                 )       MEMORANDUM DECISION AND ORDER
                                                       )       ON PLAINTIFF'S APPEAL FROM
11       vs.                                           )       ADMINISTRATIVE DECISION
                                                       )
12 MICHAEL J. ASTRUE,                                  )       ORDER REMANDING CASE PURSUANT TO
   Commissioner of Social Security,                    )       SENTENCE FOUR OF 42 U.S.C. § 405(g)
13                                                     )
                             Defendant.                )       ORDER DIRECTING CLERK TO ENTER
14                                                     )       JUDGMENT IN FAVOR OF PLAINTIFF AND
   _____                   )       AGAINST DEFENDANT
15

16       Plaintiff Steven L. Seales ("Plaintiff") seeks judicial review of an administrative decision of

17 the Commissioner of Social Security ("Commissioner") denying his claims for disability insurance

18 benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401 *et seq*., and

19 for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq*.

20 (collectively, "disability benefits").  Plaintiff filed his complaint on September 16, 2007 (Doc. 1).

21 The matter has been fully briefed by the parties.[1]

22       Pursuant to 28 U.S.C. § 636 (c) and Fed. R. Civ. P. 73, the parties consented to proceed

23 before a United States Magistrate Judge, and by order dated October 24, 2007, and docketed on

24 October 25, 2007, this action was assigned to the United States Magistrate Judge for all further

25 proceedings.  (Doc. 11).

26       _____

       [1]Plaintiff filed an opening brief and a reply brief.  (Docs. 17, 21).  Defendant filed a pleading entitled cross-
27 motion for summary judgment and opposition to Plaintiff's motion for remand.  (Doc. 20). Although briefs in Social
   Security cases previously were deemed summary judgment motions, for several years this Court has termed the pleadings
28 as "opening briefs," "responses," or "oppositions" and "reply briefs." This memorandum decision and order continues
   that trend.

**PROCEDURAL HISTORY**

Plaintiff's applications for disability insurance benefits and supplemental security income were filed on February 7, 2005 or October 5, 2005. (Administrative Record ("AR") 4, 14, 63.)[2] In those applications, Plaintiff alleged an onset of disability date of March 15, 1998, and described his disabling conditions as left knee pain, abdominal surgery for hernias, knee surgery, diabetes, kidney stones, and bipolar/post-traumatic stress disorder(s). (AR 28, 33, 35, 40, 68-69). On June 24, 2005, both applications were initially denied. (AR 28). Plaintiff's subsequent request for reconsideration on September 20, 2005 was also denied. (AR 35-35-39). On November 9, 2005, Plaintiff filed a request for a hearing before an administrative law judge ("ALJ"), and the hearing was conducted by ALJ Howard Treblin on May 25, 2006 (AR 40-41, 425-445). Plaintiff appeared at that hearing and provided testimony; he was represented by an attorney. (*Id.*) On March 28, 2007, the ALJ issued his written findings and orders in this matter. The ALJ concluded that Plaintiff was not disabled, for purposes of disability insurance benefits through December 31, 2003, the date Plaintiff was last insured under the Act. With respect to Plaintiff's application for supplemental security income, the ALJ concluded that Plaintiff was disabled under the Act beginning on October 13, 2006. The Appeals Council denied Plaintiff's September 22, 2007 request for review of the ALJ's decision on August 22, 2007, consequently the ALJ's decision constituted the Commissioner's final decision in the matter. (AR 5-9). Plaintiff then brought this timely action for judicial review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

**SCOPE AND STANDARD OF REVIEW**

Congress has provided a limited scope of judicial review of a Commissioner's decision to deny benefits under the Social Security Act. *See* 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision (made through the ALJ) when the determination is not based on legal error and is supported by substantial evidence. See *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). "The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact

---

[2]The precise date is not an issue germane to this appeal.

are supported by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)

(citing 42 U.S. C. § 405(g)). Substantial evidence is more than a mere scintilla, *Sorenson v.*

*Weinberger*, 514 F.2d 1112, 1119  n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v.*

*Sullivan,* 888 F.2d 559, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health & Human*

*Services*, 846 F.2d 573, 576 (9th Cir. 1988.) Substantial evidence "means such evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

389, 401, 91 S. Ct. 1420 (1971) (citations omitted). "[S]uch inferences and conclusions as the

[Commissioner] may reasonably draw from the evidence" will also be upheld. *Mark v. Celebrezze*,

348 F.2d 289, 293 (9th Cir. 1965). On review, the court considers the record as a whole, not just the

evidence supporting the decision of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th

Cir. 1989) (quoting *Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not the court, to resolve conflicts in the evidence.

*Richardson*, 402 U.S. at p. 400. If the evidence supports more than one rational interpretation, the

court must uphold the Commissioner's decision. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.

1984). Moreover, if there is substantial evidence to support the administrative findings, or if there is

conflicting evidence that will support a finding of either disability or non-disability, the finding of

the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).

Nevertheless, a decision supported by substantial evidence will still be set aside if the proper legal

standards were not applied in weighing the evidence and making the decision. *Brawner v. Secretary*

*of Health & Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

## RELEVANT LEGAL AND REGULATORY FRAMEWORK

For purposes of Titles II and XVI of the Act, the person seeking disability benefits must

demonstrate that he is "unable to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 423(d)(1)(A), 42 U.S.C. § 1382c(a)(3)(A). The Act also provides that a claimant shall

be determined to be under a disability only if his impairments are of such severity that he "is not only

unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other substantial gainful work which exists in the national economy." 42 U.S.C.
§ 423(d)(2)(A).

To be eligible for disability insurance benefits, a worker must, among other things, be insured for disability purposes and be disabled on that date. 42 U.S.C. § 416(i). Title 20 C.F.R. § 404.101(a) provides, in pertinent part, that an applicant's "insured status" is a basic factor in determining if someone is entitled to disability insurance benefits and that, if the person seeking those benefits is neither fully nor currently insured, no benefits are payable.

The Commissioner uses a five-step sequential evaluation process for determining whether a person is disabled under Titles II and/or XVI of the Act. 20 C.F.R. §§ 404.1520, 416.920. Step one determines whether the claimant is engaged in substantial gainful activities. If he is, benefits are denied. If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments that meet the duration requirements, i.e., the impairment(s) are expected to result in death, or have continuously lasted or are expected to last at least twelve months. If the claimant does not have a severe impairment, a combination of impairments, or meet the duration requirement, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals one of the listed impairments and satisfies the duration requirement, the claimant is conclusively presumed to be disabled. If the impairment does not satisfy those requirements, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from doing work performed in the past. If the claimant is able to perform his previous work, he is not disabled. If the claimant cannot perform this work, the fifth and final step in the process determines whether he is able to perform other work in the national economy in view of his age, education and work experience. *See Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287 (1987).

///

///

4

The initial burden of proof rests upon a claimant to establish that he "is entitled to the benefits claimed under the Act." *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)(citations omitted). In terms of the five step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ shares the burden at each step." *Tackett v. Apfel*, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999)(italics in original). The initial burden is met once a claimant establishes that a physical or mental impairment prevents him or her from engaging in his previous occupation. The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

Here, the ALJ determined that Plaintiff's earning records showed that Plaintiff had sufficient quarters of coverage to remain insured under the Act through December 31, 2003 (AR 14, 16); that Plaintiff had not engaged in substantial gainful activity since March 15, 1998, the date on which Plaintiff claimed his disability began (*id.* at p. 16); and that, since March 15, 1998, Plaintiff had severe impairments consisting of osteoarthritis of the left knee, abdominal hernia, status post surgical repair, non-insulin dependent diabetes mellitus, and psychotic disorder, not otherwise specified (AR 16), but that these impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (AR 18). The ALJ also found that, before October 13, 2006, Plaintiff had the residual functional capacity to sit, stand and/or walk for six hours each in an eight hour workday; could lift and/or carry ten pounds frequently and twenty pounds occasionally; could climb and crouch occasionally; and should never kneel or crawl. (AR 19). The ALJ further found that Plaintiff's residual functional capacity precluded Plaintiff's performance of past relevant work since March 15, 1998, but that Plaintiff was not disabled before October 13, 2006, because he could perform a significant number of jobs in the national economy prior to October 13, 2006, based on the Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.21. (AR 22-23, 14-25). According to the ALJ's findings, ///

Plaintiff was not under a disability within the meaning of the Act at any time through December 31, 2003, the date Plaintiff was last insured under the Act.

Beginning October 13, 2006, the ALJ found Plaintiff's residual functional capacity changed. (AR 21). The status of Plaintiff's mental health condition as of that date imposed additional limitations on his ability to perform work-related tasks. (AR 22, 23). The ALJ found that Plaintiff could understand, remember, and carry out simple job instructions but was limited in his ability to understand, remember, and carry out detailed instructions. Moreover, according to the ALJ, not only was Plaintiff moderately limited in his ability to interact appropriately with the public, respond to usual work pressures, and respond to changes in the work setting, Plaintiff was also limited in the ability to interact appropriately with supervisors and co-workers. (AR 21). This altered residual functional capacity, in combination with Plaintiff's age, education, and work experience, resulted in a finding of disability by the ALJ beginning October 13, 2006. The ALF further found that there was not a significant number of jobs in the national economy that Plaintiff could perform. (AR 23-24).

## ISSUES

In his opening brief, Plaintiff asserts a variety of errors – the ALJ failed to obtain the testimony of a medical expert in determining the date of onset of disability; the ALJ failed to provide clear and convincing reasons for rejecting the testimony Plaintiff gave about the severity of his symptoms; the ALJ failed to consider medical evidence of Plaintiff's obesity and its effect on his ability to work; the ALJ failed to give specific and legitimate reasons for disregarding portions of the opinion of one medical consultant; and the ALJ improperly discredited the testimony of Plaintiff's physician's assistant and case manager.

## STATEMENT OF FACTS

The facts have been presented in the administrative hearing transcript, the ALJ's decision, and the briefs filed by Plaintiff and the Commissioner. Only those facts relevant to the issues before this Court for decision will be addressed at any length here.

Plaintiff was 37 years old on March 15, 1998, the date he claimed his disability began. Plaintiff testified that he suffered from a variety of conditions on that date – problems with his left knee, abdominal hernias, bipolar disorder, diabetes, and kidney stones. He alleged these problems

limited his ability to work in that they were painful and impaired his ability to stand, lift, crawl, climb, twist, strain, or walk very far. (AR 68-69). According to Plaintiff, he stopped working on March 15, 1998 because of his pain and because his employer laid him off. (AR 69).

Plaintiff was born on September 2, 1960, and has completed the 12th grade. (AR 22). Before his disability began, Plaintiff worked as a laborer, a plumber, a data entry office clerk, and a food restaurant manager. (AR 78-89, 124.) Plaintiff has tried to study construction management, apparently without much progress. He also did part-time work in telemarketing for several weeks, but received regular poor reviews from supervisors for not achieving goals, conflicts with supervisors, and offending clients and co-workers. (AR 429-430).

## A. *Medical Evidence*

### 1. Hernia

On January 29, 1999, Plaintiff underwent surgical repair of a ventral hernia with mesh screens. (AR 239). He did well post-operatively and was discharged on February 1, 1999. (*Id.*) Shortly thereafter, Plaintiff developed a wound infection for which he was successfully treated in late February and early March of 1999. (AR 223-229). At that time, Plaintiff was given an antibiotic to eliminate the infection and Vicodin, a narcotic pain reliever, to take as needed for pain. (*Id.*) Six years later, in early January, 2005, Plaintiff was diagnosed with a recurrent ventral incisional hernia and underwent another surgical repair. (AR 185). "He tolerated the procedure well" and was discharged on the second day after his admission. (*Id.*) The discharge plan provided for return to the doctor's office as needed. (*Id.*)

### 2. Left Knee[3]

On July 25, 2001, Plaintiff was seen at the Stanislaus County Health Services Agency for left knee pain, among other things. (AR 341). On October 19, 2001, a left knee MRI was done and the impressions from that scan included some evidence of degenerative change in the knee; that "[t]he

---

[3] In September of 1999, Plaintiff went to the emergency room after falling and injuring his right elbow and wrist and his ***right*** knee. (AR 211-216). The radiology study of the ***right knee*** taken at that time showed no acute fracture, "[n]egative sail's sign for any effusion," and noticed "increase in the intracondylar space medial." (AR 212). Plaintiff was discharged from the emergency room with a ***right knee*** immobilizer and pain medication (Tylenol with codeine). (AR 212, 219.)

7

abnormal signal intensity of the proximal tibia may be normal or secondary to a small amount of contusion..."; and a meniscus tear in that knee had been surgically repaired at some previous time. (AR 337).

Plaintiff was seen by medical staff at Golden Valley Health Centers for diabetic assessment and management.  (AR 164-183).  Records of this treatment show a commencement date of August 12, 2004,  continuing through January 3, 2005.  (*Id.*)  Plaintiff was seen 11 times during this period.  (*Id.*)  On August 12, 2004, the first appointment in this series, Plaintiff reported "constant" pain in his "feet [and] body" with a severity rating of "3" on a "1-10" scale with 10 apparently being the most severe.  (AR 183).  At Plaintiff's August 24 and 31, 2004 appointments for diabetic management care, the medical provider's notes do not record any reports of knee pain by Plaintiff.  (AR 174, 176).  On September 2, 2004, Plaintiff told medical staff at Golden Valley Health Centers that his knee pain was chronic and at a "6" on the severity scale. (AR 173).  On September 7 and 14, 2004, Plaintiff reported chronic pain in his knee with a severity of "3" on each occasion.  (AR 171, 172).  At the October 1, 2004 appointment, Plaintiff reported chronic pain in his legs and knee, with a severity of "1" (AR 168).  There is no record of any complaints by Plaintiff involving left knee pain at his last three appointments from November 2, 2004 through January 3, 2005.  (AR 165-167) .

Plaintiff was seen by Dr. Farley at the Stanislaus County Health Services Agency clinic on August 19, 2003.  (AR 314).  At that time, Plaintiff was diagnosed with left knee degenerative joint disease.  (*Id.*)  An MRI was recommended.  (*Id.*)  Fifteen months later, on November 23, 2004, Plaintiff had a follow-up appointment at the Stanislaus County Health Services Agency clinic for several complaints or conditions, including his left knee pain.  (AR 311).  The need for an MRI was again noted.  No pain medication was prescribed, according the charting entry.  (*Id.*)

On April 14, 2005, Plaintiff went to the Stanislaus County Health Services Agency clinic for a consultation regarding completion of SSI forms.  (AR 298).  The diagnoses reported at that time were abdominal hernia, repaired and healed; bipolar disorder; and diabetes.  (*Id.*)  Mild effusion of the leg knee was reported under "significant findings."  (*Id.*)  The musculoskeletal assessment done apparently as part of the consultation/assessment process noted a flexion of 60

///

8

degrees in Plaintiff's left knee and full extension in the knee. (AR 299). No abnormal instability of that knee was reported. (*Id.*)

On May 14, 2005, consulting examiner, Usman Ali, M.D., conducted a comprehensive internal medicine evaluation of Plaintiff for disability assessment purposes. (AR 261-264). Included in that assessment was an examination of the condition of Plaintiff's left knee. Dr. Ali noted that Plaintiff had multiple scars on his left knee; the knee crackled or popped when the joint or the patella was moved; some joint line tenderness; and mild atrophy of the quadriceps muscle. (AR 263). Plaintiff also walked with a limp, favoring that knee. (*Id.*) Dr. Ali's various diagnoses included "arthritis left knee joint post status surgery." (AR 264).

The MRI of Plaintiff's left knee, first recommended in August of 2003, was done in December, 2005. It showed degenerative changes with narrowing of the joint space and spur formation and non-specific soft tissue edema at the medial aspect of the knee, possibly related to an injury. (AR 304-305). Clinical notes from Plaintiff's next appointment do not report any significant findings relative to Plaintiff's knee pain or any treatment prescribed for Plaintiff's knee condition or pain. (AR 303).

### 3. Kidney Stones

In February 2001, Plaintiff was assessed for the presence of a kidney stone. (AR 148, 150-151). X-rays taken at that time were normal and no treatment was required. (*Id.*) Plaintiff went to the emergency room two years later, in February of 2003, complaining of pain in his left side and low back pain. (AR 196-198). Plaintiff was diagnosed with a kidney stone and given a prescription for Vicodin for pain control. (*Id.*) Medical records from August 2003, report that Plaintiff had passed the kidney stone on his own. (AR 314).

### 4. Non-Insulin Dependent Diabetes II

Plaintiff's medical records also disclose that Plaintiff has had diabetes II for a number of years. That condition appears to have been largely stable since the date Plaintiff maintains his disability began. (*See* AR 5-445). As recently as February 10, 2006, health care providers' notes report that Plaintiff's diabetes was under good control, that Plaintiff was feeling good and exercising. (AR 401).

***B.***     ***Mental Health Condition***

      Plaintiff appears to have a history of mental health conditions going back a number of years. In 1999, psycho-social progress notes from a visit Plaintiff had with David Sandoval, an M.S.W. affiliated with the Stanislaus County Health Services Agency, reported that Plaintiff had a past history of depression and anxiety and admitted to problems with alcohol and crank in his past. (AR 357). Plaintiff reported at that time that he had been diagnosed with attention deficit disorder while in prison. (*Id.*) Mr. Sandoval stated that Plaintiff had significant social stressors at that time but also had a good social support, including church and friends. (*Id.*)

      Progress notes made by Dr. Victor Chen with the Stanislaus County Health Services Agency report prescribing Wellbutrin to Plaintiff in September 1999. (AR 349). In November 1999, Plaintiff again met with mental health care provider, David Sandoval, and explained to Mr. Sandoval that he had an explosive personality disorder, depression, anxiety and adult attention deficit disorder. (AR 335).

      On August 3, 2000, Plaintiff was incarcerated, having been convicted of corporal punishment of a child, i.e., hitting his son. (AR 154, 152). Clinical psychologist M. Alexander conducted a condensed mental health assessment of Plaintiff at that time. Plaintiff reported no prior history of psychiatric hospitalization, but did describe a history of explosive violence. (AR 155-157). Plaintiff said he was taking Wellbutrin for management of attention deficit disorder symptoms prior to this incarceration and he "got violent behind" the medication. (*Id.*) Dr. Alexander diagnosed Plaintiff with a depressive disorder, not otherwise specified (Axis I) and a narcissistic personality disorder (Axis II). (AR 156). Dr. Alexander also assigned Plaintiff a score of 59 on the Global Assessment Functioning ("GAF") scale. (*Id.*) Under "Present Mental Status," Dr. Alexander described Plaintiff's appearance, behavior, cognition, insight and judgment, and interview attitude as within normal limits at that time. (*Id.*) However, Plaintiff's mood was described as decreased, his sleep decreased, decreased appetite and concentration, and restricted affect. (AR 158). No hallucinations or delusions were noted. (*Id.*) No current suicidality was present. (*Id.*) Plaintiff reported no current desire to hurt himself or others. (AR 161).

///

In February 2001, Dr. Alexander conducted another psychological evaluation of the Plaintiff. (AR 152-153). Dr. Alexander reported that while incarcerated, Plaintiff had participated in group treatment for depression and anger management and that he had been disciplinary free while incarcerated. Dr. Minou observed that Plaintiff "was alert and cooperative. While mood and effect were within normal limits, moods did appear dysthymic and effect was somewhat restricted. His thought process was clear for any symptoms of a psychosis. Cognitive functioning was intact and ... [m]ental functioning was within normal limits." (AR 152). The plan for Plaintiff's parole included continuation of medication, although the type was not specified. Under "Clinical Impressions," Dr. Minou noted that [Plaintiff] had a clear understanding of his problem with anger and stress management ... and continues to have problems with anger management . . . Until he can take responsibility for his behavior he will continue to have problems with his aggression." (*Id.*)

After his release from incarceration, progress notes from July 2001 show that Plaintiff had been diagnosed with depression and was provided Celexa to help manage that condition. (AR 341). Neurontin appears in the charting entries in October 2001. (AR 338).

In February 2003, Plaintiff was taking no medication for his mental health condition. (AR 327). On August 19, 2003, progress notes from Stanislaus County Health Services Agency reflect that Plaintiff had "stopped taking meds since 5/03" under "current meds" and another notation of "too busy." (AR 314).

In August 2004, progress notes from Golden Valley show Plaintiff was taking Geodon with Cogentin and Celebrex added later that month. (AR 172, 176). Plaintiff reported increased irritability, decreased sleep, severe temper and "cycling" during this time frame. (AR 176). Although Plaintiff reported doing fairly well on that regimen for a time, i.e., increased energy, concentration, talking, interacting, increased sleep, decreased aggression and depression, by December of 2004, he was reporting feeling rage but not acting on it, describing obsession over thinking about hurting someone. (AR 166, 171). Plaintiff also reported that he had stopped taking Seroquel because of the daytime drowsiness it caused. (*Id.*) His diagnosis at that time was bipolar disorder. (*Id.*) Depakote was added to his medications. (*Id.*) Within a month, Plaintiff reported that the Depakote had calmed his violent moods. (AR 165).

On May 4, 2005, a "Brief Clinical Screening" form was completed by a psychologist clinician at Stanislaus County Behavioral Health and Recovery Services. (AR 260). The clinician conducted one interview with Plaintiff, after a referral from Mr. Sandoval and Dan Cox, a physician's assistant. (AR 334, 336). Plaintiff's apparent goal was to obtain completion of the forms necessary for his application for disability benefits under the Act. (AR 260, 298). On the form, the clinician gave a series of DSM IV diagnostic impressions, including an Axis V GAF score of 18. (AR 260).

A psychiatric evaluation for the period covering March 15, 1998 through December 31, 2003, was completed on May 6, 2005 by Manolito Castillo, M.D. (AR 252-256). The stated diagnoses included bipolar disorder, not otherwise specified, and antisocial personality traits. Dr. Castillo gave Plaintiff a GAF score of 76. (AR 252-256). Plaintiff was fully oriented with normal speech and social interaction. (AR 254). Plaintiff was not easily distracted, his concentration was good, his mood was appropriate, and he denied suicidal or homicidal ideations. (AR 254-255). No significant mental limitations were identified. (AR 255- 256).

On May 9, 2005, Plaintiff was seen by a health care provider at Stanislaus County Behavioral Health and Recovery Services for a psychiatric medication evaluation. (AR 258-259). Plaintiff reported that the Geodon medication he had been taking since August of 2004 "which helps him 'carry a conversation and able to pull himself together.' " (AR 258). The psychiatrist found no evidence of psychosis or mania. (*Id.*) Plaintiff denied suicidal or homicidal ideations. (*Id.*) Plaintiff was diagnosed with depression disorder, not otherwise specified, intermittent explosive disorder and antisocial personality disorder. (AR 259). Plaintiff's Geodon prescription was continued and Lexapro was added.

On June 23, 2005, treatment notes described as "Psych-Social" and signed by Mr. Sandoval indicated that Plaintiff reported doing well in the sober living environment and that he planned to attend college classes for construction job site management beginning in August, with plans to eventually transfer to a four-year college. (AR 294). Plaintiff was excited about the opportunity to attend school, and stated that his new medication, Effexor, was helpful because it did not have side effects. (AR 294).

### C. Medical/Health Care Provider Opinions Relating to Plaintiff's Residual Functional Capacity and Disability Status.

On April 8, 2005, Physicians' Assistant Cox completed a form stating that Plaintiff was unable to work full or part-time due to his hernia repair and left knee, that Plaintiff's prognosis was fair, that Plaintiff's disability was temporary, that its expected duration would be months, i.e., March 14, 2005 to May 14, 2005. (AR 302).

On May 14, 2005, Dr. Ali performed a comprehensive internal medicine evaluation of Plaintiff, examining him as part of that evaluation process. (AR 261-264). Dr. Ali's diagnoses included left knee joint arthritis, abdominal hernia status post-surgery, non-insulin dependent diabetes mellitus, history of kidney stones, history of bipolar disorder, and history of post-traumatic stress disorder. (AR 264). With respect to Plaintiff's functional limitations, Plaintiff could, in Dr. Ali's opinion, lift and carry 20 pounds; could stand and walk for four to six hours in an eight-hour workday, with breaks every 30 minutes; could sit for six eight hours, with breaks every two hours; and would have difficulty in climbing, pushing and pulling, doing repeated bending, stooping, crouching and crawling movements. (AR 264).

On June 2, 2005, a Physical Residual Functional Capacity Assessment was completed by a State Agency medical consultant. (AR 265-271). The consultant did not examine Plaintiff as part of this assessment. The conclusions reached in this document were that Plaintiff could occasionally lift 20 pounds; could walk or stand for a total of at least 2 hours in an 8-hour workday but would need a break every 30 minutes; could sit with normal breaks for about 6 hours in an 8-hour workday; was limited to "1/3" in the left lower extremity for pushing and pulling; could frequently balance and stoop, occasionally climb and crouch, but could never kneel or crawl. (*Id.*)

Another Physical Residual Functional Capacity Assessment was prepared on September 15, 2005. (AR 363-372). It was completed by a non-examining, non-treating medical consultant M.D. (AR 370). According to this medical consultant, Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk for two out of eight hours, and could sit with normal breaks, for six out of eight hours; and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (AR 363-372).

13

Regarding impacts related to Plaintiff's mental health conditions, in September 2005, State Agency physician, Dr. Morando, reviewed all available medical evidence and opined that Plaintiff could perform simple, routine, repetitive tasks with minimal public contact. (AR 272-275, 274).

In a psychiatric evaluation dated October 13, 2006, Stefan Lampe, M.D., Board Certified in psychiatry, stated that Plaintiff could understand, remember and carry out both simple and more technical job instructions but would have difficulty relating and interacting with supervisors and co-workers. (AR 421). Dr. Lampe doubted whether Plaintiff could withstand the pressure and stress associated with an eight hour workday on an ongoing basis. (AR 421).

### D.    *Adult Third Party Lay Information*

John Stolarz, who served as Plaintiff's case manager, prepared a function report for use in this proceeding. (AR 90-98). The report was dated February 23, 2005, approximately four months after Mr. Stolarz first met Plaintiff. (AR 90). Case manager Stolarz served as part of support provided for substance abuse relapse prevention. Plaintiff lived in a boarding house, apparently in his own room. (AR 90-98). Plaintiff's day consisted of following the treatment schedule and groups, and going to 12-Step meetings. (*Id.*) Plaintiff had no problem with managing his personal hygiene, prepared his own meals, did light housework, and needed help with some shopping because he could not carry heavy packages. (*Id.*) Mr. Stolarz explained that Plaintiff could not do "heavy work, no bending over, no lifting." (AR 93). Plaintiff reportedly got out of the house twice daily, could go alone, and used public transportation. (*Id.*) Plaintiff was able to pay his own bills, count change, and handle a checkbook. (*Id.*) Mr. Stolarz reported that Plaintiff's hobbies and interests were impacted by Plaintiff's inability to "sit in one spot any length of time." (AR 94). In terms of social activities, Plaintiff attended 12-Step meetings and groups daily, but was isolated from family, friends and others because of behavior issues. (*Id.*)

Mr. Stolarz reported that Plaintiff has trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, seeing, memory, stair-climbing, completing tasks, concentration, following instructions and getting along with others. (AR 95). According to Mr. Stolarz, Plaintiff could lift about 5 pounds, and could walk about one-half block before he needed to rest for fifteen minutes because of knee swelling. (*Id.*) Plaintiff could pay attention for about twenty minutes,

14

could not finish what he started, and had trouble following written instructions. Mr. Stolarz also reported that Plaintiff could not get along at all with authority figures. (*Id.*) He believed that Plaintiff could not handle stress, could not manage change, and lacked the ability to cope and problem solve. According to Plaintiff's case manager, Plaintiff took his medication in order to function. (*Id.*) Mr. Stolarz concluded that all these difficulties were the result of Plaintiff's injuries and/or behaviors. (*Id.*)

### E.     *Hearing Testimony*

At the May 25, 2006 hearing, Plaintiff was represented by an attorney, and testified. (AR 425-445).

Plaintiff stated that he was six feet tall and that his normal weight was 285 pounds. (AR 428). His driver's license was suspended but he knew how to drive. (AR 428). Plaintiff finished high school and was taking college classes through the State Rehabilitation program for construction management. (AR 428-429). Plaintiff could read, write and perform simple math. (AR 429). At the time of the hearing, he had been working as a telemarketer for about two weeks, part-time, 25 hours a week. (*Id.*) Plaintiff reported doing badly at the job; he was not making his set goals and was experiencing conflicts with customers and supervisors ("talking back"), and isolating from co-workers. (AR 429- 430). He testified that he did plumbing work in the past for eight years and worked in fast food management some time before that. (AR 430).

With regard to the conditions he experienced as disabling, Plaintiff testified that his physical impairments were degenerative joint disease in his left knee and recurrent hernias, and would need a knee replacement in the future. (AR 431). He had chronic kidney stones and diabetes. (*Id.*) Plaintiff also reported that he had a mental impairment - bipolar and depression. (*Id.*) He experienced depression and mania in cycles, which lasted anywhere from two days to one and one-half weeks at a time. (AR 431-432). Plaintiff took medications for his mental illness that he said helped a little but caused dizziness, nausea, sleeplessness, and fatigue. (AR 432). Plaintiff testified that hostility and anger were "big problems" for him but had not seen a mental health counselor or therapist for that since 2004 because of a lack of insurance. (AR 432-433). Plaintiff stated that he often felt angry and agitated. (AR 433).

Plaintiff testified that he used Tylenol to treat his physical pain and stays away from narcotics because he is a recovering addict. (AR 434). With regard to pain, Plaintiff said that his good days and bad days were about equal, a bad day being a "10" on a severity scale ("1" to "10" with 10 being most severe) and a good being a "4." (*Id.*) Plaintiff believed he was getting worse, physically and mentally. (*Id.*) His knee symptoms got worse when walking and sitting, but he stated that he could sit comfortably for two hours at one time before he had to get up and move around. (AR 435). He testified that he could stand or walk for twenty minutes before his knee "stiffen[ed] up" and, as of the hearing date, he could lift or carry about lift 50 pounds. (*Id.*) Lifting any greater weight would aggravate his hernia. (AR 441). Plaintiff stated that he could comfortably bend over and touch his knees, but no farther, because of problems with his abdomen. (AR 436).

Plaintiff also testified that he took medication for his concentration difficulties and that his memory was "slipping." (AR 436). Spending time alone made him feel better emotionally. (*Id.*) Confrontation made his emotional pain worse. (*Id.*) Since getting out of prison in 2004, Plaintiff said that he had mostly lived in the structured environments of recovery homes. (AR 444). He currently lived in a sober living environment, sharing a large home with nine other people. (AR 437). He isolates from his house mates by choice, but attends NA meetings regularly. (AR 437-438). He cleans the bathroom as part of household responsibilities and watches some television during the day. (AR 433-434). Plaintiff also reported not "follow[ing] through" on his personal hygiene on an average of three days per week "because it's ... too much." (AR 443). Plaintiff also testified that he did not use a cane for assistance because he was certain that at some point he would use it as a weapon. (AR 443).

## DISCUSSION

### A.     *Date of Onset*

In this case, the ALJ found that Plaintiff was not disabled on the date Plaintiff alleged his disability began, i.e., March 15, 1998. Rather, given the record evidence, the ALJ concluded that Plaintiff first became disabled considerably later, on October 13, 2006. Plaintiff maintains that arriving at this conclusion required the use of a medical expert, that the ALJ failed to do so, and, as a result, committed legal error.

Plaintiff contends that the date of onset of his disability could not reasonably be determined from the record evidence and, therefore, the opinion of a medical expert was necessary to assist in that determination. *Armstrong v. Commissioner of Social Security*, 160 F.3d 587, 589-590 (9th Cir. 1998); *DeLorme V. Sullivan*, 924 F.2d 84, 848-849 (9th Cir.1990); SSR No. 83-20. Plaintiff argues that there was considerable evidence in this record that would show Plaintiff's alleged disability began on March 15, 1998, as Plaintiff claimed, rather than October 13, 2006, as the ALJ found. In support of his position, Plaintiff cites to portions of the extensive diagnostic and treatment histories in this case record covering the various physical and mental impairments implicated in Plaintiff's application for benefits. Plaintiff seems to argue that the ALJ could not reach a valid conclusion about the date of onset without the assistance of a medical expert because of the length of time between the date of alleged onset and the determined date of disability, the changing status of Plaintiff's various allegedly disabling conditions during that time, and the treatment provided for those conditions. Under such circumstances, the ALJ would have to rely on impermissible inference from the available medical records, according to Plaintiff.[4]

The ALJ's onset determination date had a legitimate medical basis. The condition that ultimately produced the requisite degree of compromised functional capacity qualifying Plaintiff for benefits under the Act was his mental impairment and its impacts on Plaintiff's work-related capacities. The record is replete with medical evidence and third party information documenting the changing status of Plaintiff's mental and physical impairments over the full course of the period in question. Diagnostic impressions, treatment plans, efficacy of interventions, and impacts on functioning of these various conditions were comprehensively addressed in the case file and reviewed by the ALJ in rendering his decision. The psychological assessments done by several different health care providers about one year before the May 25, 2006 hearing (which, with the exception of the September 2005 evaluation mentioned below, were the most recent evaluations

---

[4] For purposes of deciding the issue raised by Plaintiff in his argument, this Court will assume the ALJ was correct in his assessment of the physical residual functional capacity Plaintiff retained after considering the limitations imposed by his severe medically determinable physical impairments. We are constrained to do so because "ordinarily we will not consider matters on appeal that are not specifically and distinctly argued in an appellant's opening brief." *Carmickle v. Commissioner, Social Security Administration*, 533 F.3d 1155, 1161 (9th Cir. 2008).

available prior to the administrative hearing) consistently[5] showed a claimant with mental health conditions who functioned reasonably well, was not actively psychotic, interacted (albeit on a limited basis) with others on a regular basis, was not suicidal or homicidal in his thoughts, had intact cognitive functioning and no thought disorders, pursued appropriate monitoring of and treatment for his health care problems, cooperated with his health care providers, took medication he found to be effective in managing the impacts of his mental health condition, and was able to meet his basic living needs in a competent fashion and on a consistent basis.

In September 2005, a State Agency physician looked at the available medical evidence and completed a mental residual functional capacity assessment, concluding that Plaintiff could perform simple, routine, repetitive tasks with minimal public contact. (AR 272-275). At the hearing held five months later, in May of 2006, the evidence showed that Plaintiff continued to live in a community setting, interacted with others regularly (e.g., 12-Step meetings, part-time employment), performed his activities of daily living in a competent manner without much assistance and with no prompting, managed his own finances, was able to understand and respond to questions posed by the ALJ and his attorney during the course of the hearing, continued to take medication for his mental health conditions, had considerable insight into the symptoms of his mental disorders and the risks those symptoms might pose and took appropriate steps to reduce those risks (e.g., minimizing unnecessary social contacts). The case record shows that Plaintiff had not been hospitalized for mental health-related crises. (AR 5-445).

The foregoing is not to say that Plaintiff presented as symptom-free at the hearing. Plaintiff's attitude and posturing was one of significant hostility, an observation the ALJ made as a result of

---

[5] The only evidence in this record from an acceptable medical source that provides any support for the suggestion that there may have been some significant fluctuation over time in Plaintiff's mental health status and functioning over time comes from a "Brief Clinical Screening" done around this same time period, i.e., May of 2005. That screening assigned to Plaintiff a GAF score of 18 at that time. Such an assessment is markedly inconsistent with several other psychological assessments done at the same time by different medical experts, as well as with earlier and later GAF scores. The ALJ specifically gave little weight to this document because the opinion was "not consistent with the weight of the longitudinal treatment records and appear[ed] to be an effort to assist the claimant in obtaining Social Security disability benefits." (AR 21). The Commissioner is correct in noting that the Regulations contemplate consideration of the longitudinal course of an impairment. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). The ALJ's assignment of little weight to this opinion was not improper.

Plaintiff's demeanor at the hearing. (AR 22). However, there was no indication in this record that Plaintiff's behavior was threatening or untowardly aggressive at that time. It was only later – sometime during the following four-plus month period – that Plaintiff's cognitive functioning deteriorated to a point where his functional capacities could be said to be disabling. In mid-October, 2006, Dr. Lampe, a psychiatric medical expert, diagnosed Plaintiff, for the first time, as experiencing symptoms consistent with a psychotic disorder, not otherwise specified. For the first time, according to this record, the symptoms of Plaintiff's mental health condition precluded him from performing basic work-related tasks. The ALJ properly gave this opinion substantial weight to Dr. Lampe's opinion. (AR 22).

Because of the fairly comprehensive longitudinal medical record available to the ALJ and the relatively brief period of time between the hearing date and the next psychological evaluation identifying disabling impacts, it is difficult to see how additional medical expertise could have provided any truly useful or reasonably necessary information to the ALJ. Moreover, there is very little ambiguity or vagueness in this record that would put the ALJ "on notice" that further expert assistance was needed to determining the date of onset. Under these circumstances, the ALJ was not required to secure additional medical expertise to assist in determining the date on which Plaintiff became disabled for purposes of the Act.

## B.    *Credibility of Plaintiff's Symptom Testimony*

Plaintiff argues that the ALJ failed to provide clear and convincing reasons for rejecting his testimony regarding the severity of Plaintiff's symptoms. Plaintiff contends that the ALJ erred by discrediting his testimony on the grounds that his subjective symptoms were not supported by objective medical evidence and for failure to use narcotic pain medication.

A claimant who alleges disability based on subjective symptoms must produce objective medical evidence of an underlying physical or mental impairment, i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the pain or other alleged symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)(*en banc*); SSR No. 96-7p. Once that demonstration is made, and if there is no affirmative evidence suggesting the Plaintiff is malingering, the ALJ may reject the claimant's

testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion. *Id.* The ALJ did so in this matter.

When determining whether a claimant's testimony regarding the severity of his symptoms is credible, the ALJ must consider the factors set out in SSR No. 96-7p when assessing the credibility of the claimant's subjective complaints. The ALJ may also consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

Here, the ALJ conducted a detailed and comprehensive review of the medical evidence in the case record for the period beginning on the alleged onset date (March 15, 1998) to the date of the ALJ's written decision. The ALJ found such evidence established that Plaintiff had severe impairments of osteoarthritis of the left knee, abdominal hernia, status post surgical repair, non-insulin dependent diabetes mellitus and psychotic disorder, not otherwise specified, since March 15, 1998. The ALJ also concluded that "[Plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms [we]re not entirely credible prior to October 13, 2006." (AR. 20).

In reaching this credibility conclusion, the ALJ considered the following:

1. Plaintiff's work history, including eight years as a plumber, some earlier years in fast food restaurants, and a recent brief stint as a telemarketer;

2. Plaintiff's testimony that he was unable to work prior to October 13, 2006, due to impairments that caused pain and limited his ability to stand, lift, crawl, climb, twist, strain, or walk;

3. Plaintiff received various forms of treatment for his allegedly disabling left knee and hernia;

4. The impact of those treatments (i.e., they had generally been successful in controlling the pain associated with those conditions);

5.   Plaintiff had not taken any narcotic-based pain relief medication in spite of his allegations of "quite limiting pain" because of his past drug problems;

6.   Plaintiff used Tylenol for pain relief and that Plaintiff rested occasionally to relieve the swelling in his knee;

7.   Plaintiff's knee symptoms were worsened by walking and sitting but that, according to Plaintiff's testimony, he could sit for two hours comfortably at one time before having to get up and move around and that he can walk or stand for twenty minutes at a time;

8.   Plaintiff experienced the intensity of his pain as a "10" on a bad day and 4 on a good day, (scale of 1 to 10, 1 being "not so bad" and 10 being "really bad pain");

9.   Plaintiff had a mental impairment he described as bipolar disorder and depression;

10.   Plaintiff testified that he was taking medication for this disorder;

11.   Plaintiff testified that his mood improved after he began taking Geodon;

12.   Plaintiff testified that the medications he was taking for his mental health condition "help[ed] a little";

13.   The medications cause dizziness and nausea;

14.   Plaintiff gets about six hours of sleep each night, rising at about 6:30 a.m., but does not wake feeling rested;

15.   Plaintiff felt tired all the time but could not sleep;

16.   Plaintiff felt he was getting worse mentally and physically;

17.   Plaintiff lived in a boarding home that he shared with nine other people;

18.   Plaintiff was independent in his daily living activities, taking care of his personal grooming, preparing simple meals, cleaning his living area as well as the bathroom at the communal residence, and regularly attending 12-Step meetings;

19.   Plaintiff testified that he spent most of each day alone, watching television or just sitting;

20.   Plaintiff testified that he was unable to do the things he enjoys such as beading and fishing because of his symptoms;

21.   Plaintiff testified that he was not receiving regular mental health treatment (in the form of counseling or therapy or seeing a psychiatrist) because he did not have access to such treatment

through his health care provider and that the last time he saw a psychiatrist [testimony was as to "a mental health counselor or a professional"] was in 2004;

22. Plaintiff described feeling angry all the time and struggled with those feelings;

23. Plaintiff testified that he cannot get along with others but did not know why;

24. Plaintiff testified that he had conflicts with supervisors, co-workers, customers at his most recent job as a telemarketer, leading to poor performance reviews; and

25. Plaintiff testified that he spent a lot of time alone but nothing made him feel better and confrontation made him feel worse.

The above list of considerations weighed by the ALJ demonstrates that, in deciding the credibility of, and the weight to be assigned to, Plaintiff's testimony about his subjective symptoms, the ALJ considered most, if not all, of the factors outlined in SSR No. 96-7p, i.e., the objective medical evidence produced by Plaintiff; Plaintiff's daily activities; the location, duration, frequency, and intensity of Plaintiff's pain and other symptoms; factors that precipitated and aggravated Plaintiff's symptoms; the type, dosage, effectiveness, and adverse side effects of any medication for pain or other symptoms Plaintiff took; and measures other than treatment used by the individual to relieve the pain or other symptoms.

In finding that Plaintiff's statements about the persistence, intensity, and limiting effects of symptoms were not entirely credible before October 13, 2006, the ALJ based his conclusion on a number of clear, articulated reasons – medical treatment Plaintiff received that was generally successful in controlling Plaintiff's subjective symptoms; Plaintiff's decision not to take narcotic pain relief medication for pain he alleged was quite substantial and persistent; the degree of inconsistency between what is contained in the medical records as to Plaintiff's symptoms and functional limitations and what Plaintiff alleges in these disability claims under the Act; and the fact that Plaintiff's treating physicians (who provided extensive information in the form of Plaintiff's medical records) had not indicated that Plaintiff was disabled prior to October 2006 or that he had functional limitations greater than those that the ALJ determined to be present. That fact, and the reasonable inferences the ALJ drew from it, were legitimate and appropriate considerations in evaluating the credibility of P's description of his subjective symptoms. SSR No. 96-7p instructs, in

part:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. ... [¶] One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as ... [t]he degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment [emphasis added.]

The evidence supporting the ALJ's rejection of Plaintiff's credibility is substantial. Moreover, it demonstrates that the ALJ did not arbitrarily reject Plaintiff's testimony. The ALJ discussed the evidence that is significant or probative, and explained the weight to which he assigned Plaintiff's testimony regarding his subjective complaints, i.e., not entirely credible as to their intensity, persistence, and limiting effects prior to October 13, 2006. (AR 20). As is required, the ALJ's determination contains cogent, articulated reasons for the finding on credibility, is supported by the evidence in the case record, and is sufficiently specific to make clear to this Court the weight the ALJ gave to Plaintiff's statements and the reasons for that weight. SSR No. 96-7p; *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). From the record, this Court can and does conclude that the ALJ did not arbitrarily discredit Plaintiff's testimony. *Bunnell*, 947 F.2d at pp. 345-46 (9th Cir. 1991) (*en banc*).

Plaintiff also contends that the ALJ improperly discounted the credibility of Plaintiff's testimony regarding his knee pain, in part, because Plaintiff did not take pain-relieving narcotic medication for apparently serious pain. Plaintiff argues that such diminution in weight was impermissible, given Plaintiff's articulated reason for avoiding narcotics – his status as a recovering drug addict. While this Court sees the validity in Plaintiff's argument (see *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007)), the Court concludes that any error here would have been harmless.

Where only some of the specific reasons stated by an ALJ for rejecting an applicant's credibility are legally sufficient or supported by the record, but others are not, *Batson v.*

*Commissioner of Social Security Administration*, 359 F.3d 1190, 1195-1197 (9th Cir. 2004) compels this Court to consider whether the ALJ's reliance on invalid reasons was harmless error. Such errors are harmless and do not warrant reversal where there remains substantial evidence supporting the ALJ's conclusions on credibility, and the error does not negate the validity of the ALJ's ultimate credibility conclusions. *Carmickle v. Commissioner , Social Security Administration*, 533 F.3d at 1162. The relevant inquiry is not whether the ALJ would have made a different decision absent any error, but rather whether the ALJ's decision remains legally valid despite such error. Here, the Court concludes from the analysis and discussion provided by the ALJ that there remains substantial evidence in this record to support the ALJ's decision on Plaintiff's subjective symptoms credibility and that any error in this regard would not negate the validity of the ALJ's ultimate conclusion on credibility. *Batson*, 359 F.3d at p. 1197.

Plaintiff's remaining arguments on this issue are also not persuasive. Contrary to Plaintiff's suggestion, finding significance in the fact that Plaintiff's treating physicians did not describe Plaintiff as having any greater functional limitations that those identified by the ALJ does not somehow impermissibly shift the burden of proof on the issue of medically determinable impairments of sufficient severity sufficient to preclude Plaintiff from engaging in substantial gainful activity. The burden of proof on that issue belongs to the Plaintiff. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).

Plaintiff's argument that his limited financial resources precluded him from producing evidence from his treating physicians that would show he was disabled or had limitations greater than those identified by the ALJ is without merit. Plaintiff's citation to a specific portion of the case record does not support the factual proposition he asserts.

### C.    The ALJ's Failure to Consider Obesity and Its Functional Impacts

Plaintiff asserts that the ALJ was required to consider the medical evidence regarding Plaintiff's obesity and the functionally limiting effects it had on Plaintiff's ability to work, and that the ALJ failed to do so.

Plaintiff's argument begins by acknowledging that the issue of Plaintiff's obesity "wasn't fully argued to the ALJ." In fact, the issue was not raised at all. In his various applications for

benefits and requests for further consideration of administrative decisions, Plaintiff did not identify obesity as a disabling condition or a contributing factor to his claimed disabilities. Nor did he argue before the ALJ that his obesity was disabling or somewhat contributed to his medically determinable physical impairments in a significant way. And here, unlike the claimant in *Celaya v. Halter*, 332 F.3d 1177 (9th Cir. 2003), Plaintiff was literate and with some educational success. Moreover, unlike Ms. Celaya, Plaintiff was represented by counsel in this matter from and after early January, 2005, including representation at the hearing before the ALJ. Unless excusing compliance is necessary to avoid a manifest injustice, when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal to the courts. *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999). This is because the ALJ, rather than this Court, is in the optimal position to resolve any issues regarding a claimant's condition. *Id.* Because Plaintiff has not shown that he raised the issue of obesity before the ALJ or the Appeals Council (*see* AR 33-34), Plaintiff has waived his right to obtain judicial review of the issue here.

Even were this Court to assume that such a waiver had not occurred, the Court does not agree with Plaintiff's position. As the Commissioner competently notes, "simply calling Plaintiff obese does not render him disabled due to his weight." Social Security Ruling No. 02-1p acknowledges that a Plaintiff's obesity can affect his or her physical and mental health and is to be considered in evaluating the combined effects of obesity with other medically determinable impairments for purposes when reaching a decision on the issue of disability. Again as the Commissioner asserts, "the ruling recognizes that the extent of a claimant's obesity does not automatically correlate with any specific degree of impairment or functional loss." SSR No. 02-1p.

The analysis in *Burch v. Barnhart*, 400 F.3d 676, 682-684 (9th Cir. 2005) is particularly useful here. Although Plaintiff contends that the ALJ erred in not considering obesity in determining whether Plaintiff met or equaled a listing impairment, he did not identify which listing he believed he met or equaled. Further, Plaintiff did not set forth any evidence which would support the diagnosis and findings of a listed impairment. 20 C.F.R. § 404.1525(d). Plaintiff bears the burden of proof that he has an impairment that meets or equals the criteria listed in Appendix 1 of the Commissioner's regulations. *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989). And, unless

the Plaintiff presents evidence in an effort to establish equivalence, the ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination.  *See Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001.)

As Social Security Ruling No. 02-01p explains, each case must be evaluated based on the record.  Here, there is substantial evidence in the record to support the conclusion that the ALJ did not ignore the issue of Plaintiff's weight in arriving at his conclusions regarding Plaintiff's disability status.  The ALJ queried Plaintiff about his height and weight at the hearing.  And the ALJ relied substantially on the opinion of Dr. Ali, the State Agency consultative examiner, who concluded, after a comprehensive internal medicine evaluation, that Plaintiff had physical residual functional capacities that would permit Plaintiff to perform some level of basic work activities.  (AR 261-264). In arriving at his assessment of functional limitations and residual abilities, the State Agency examiner specifically noted Plaintiff's height and weight and described Plaintiff as obese.  (AR 262).

Given all of these considerations, Plaintiff has not persuaded the Court that his claim of error on this ground is well-taken.

### D.     The ALJ's Evaluation of the Testimony of the Physician's Assistant and Plaintiff's Case Manager

Plaintiff argues that the ALJ improperly rejected the testimony of Plaintiff's case manager, John Solarz, regarding Plaintiff's subjective symptoms, and the evidence of disability provided by Physician's Assistant Dan Cox.

The ALJ gave little weight to Mr. Cox's March 2005 opinion that Plaintiff was unable to work due to his hernia repair and left knee problems.  He did so because Mr. Cox's opinion was unsupported, brief, and conclusory, set out in a checklist form with no explanations for his conclusions.  The ALJ also discounted the weight of Mr. Cox's conclusion because he was a physician's assistant and, therefore, not an acceptable medical source.  There is no error based upon the record before the Court.

The Social Security regulations exclude physicians' assistants from the category of "acceptable medical sources."  20 C.F.R. §§ 404.1513(a), (d)(1), 416.913(a), (d)(1) (2007).  As a consequence, the opinions of physicians' assistants cannot be used to establish the  existence of a

medically determinable impairment; cannot provide medical opinions; and are not considered to be "treating sources" whose opinion may be entitled to controlling weight. 20 C.F.R. §§ 404.1502, 416.902, 404.1513(a), 416.913(a), 404.1527(a)(2), (d), 416.927(a)(2), (d) (2007); SSR No. 06-03p. However, a physician's assistant may be considered to be an acceptable medical source where the assistant consults frequently and works closely with a physician and thus acts as an agent of the doctor in the relationship with the patient. *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996).

Here, the record does not contain the requisite evidence to allow Mr. Cox to be considered an acceptable medical source. There is no evidence that Mr. Cox was closely supervised by any physician. There is no probative evidence regarding Mr. Cox's professional relationship with any other medical professionals in his group. Therefore, Mr. Cox cannot properly be considered an acceptable medical source based on the record before the Court.

As a physician's assistant, Cox was an "other medical source" whose opinion could be considered with respect to the severity of Plaintiff's impairment and how it affected his ability to work. An "other source" may be given less weight than an opinion from acceptable medical sources. *Id.* at p. 971. To the extent that Cox is considered an "other source," the ALJ's opinion reflects that the ALJ gave little weight to Cox's opinion because (1) he was not an acceptable medical source, and (2) his opinion was unsupported, brief, and conclusory. These are reasons germane to the ALJ's opinion and, therefore, sufficient to justify his treatment of Mr. Cox's opinion. *Cf. Dodrill*, 12 F.3d at 918-919.

Similarly, the ALJ's assignment of little weight to the statement of Plaintiff's case manager is adequate under the law. The ALJ concluded that Mr. Stolarz had a "vested interest in the outcome of this matter" as Plaintiff's case manager. The ALJ also stated that much of Mr. Stolarz' information appeared to rely, in significant part, on Plaintiff's own subjective complaints, which the ALJ had determined were not supported by the objective medical evidence before October 13, 2006. These are reasons germane to the ALJ's opinion and, as such, are considered legally sufficient. *Id.*

### E.     *The ALJ's Evaluation of the State Agency Medical Consultant's Opinion*

Plaintiff argues reversible error based on the alleged failure of the ALJ to give specific and legitimate reasons for disregarding the functional limitations of one of the State Agency's medical

27

consultants.  Specifically, Plaintiff challenges the ALJ's failure to properly credit the opinion of a State Agency medical consultant who concluded that Plaintiff was limited to standing and walking for two hours out of an eight-hour workday and even then would require a break from that activity every one-half hour.

The ALJ found that, prior to October 13, 2006, Plaintiff had the residual functional capacity to sit, stand, and/or walk for six hours each in an eight-hour workday.  He could lift or carry 10 pounds frequently and 20 pounds occasionally.  He could climb and crouch occasionally but should never kneel or crawl.  As a result, the ALJ concluded that Plaintiff had the ability to perform the full range of light work from an exertional standpoint.

In this case, there were no opinions rendered by Plaintiff's *treating* physicians specifically addressing the physical residual functional capacities Plaintiff had as of the alleged date of onset through the date of the ALJ's ruling.  There were, however, three such assessments done by State Agency physicians serving as medical consultants.   On May 14, 2005, Dr. Ali performed a comprehensive internal medicine evaluation and examination of Plaintiff.  (AR 261-264).  Dr. Ali opined that, with respect to functional limitations, Plaintiff could lift and carry 20 pounds; *could stand and walk* for four to six hours in an eight-hour workday, *with breaks every 30 minutes*; could sit for six to eight hours, with breaks every two hours; and would have difficulty in climbing, pushing and pulling, doing repeated bending, stooping, crouching and crawling movements.  (AR 264).

Another Physical Residual Functional Capacity Assessment was completed by a State Agency medical consultant on June 2, 2005.  (AR 265-271).  The consultant did not examine Plaintiff , and the consultant concluded that Plaintiff could occasionally lift 20 pounds; *could walk or stand* for a total of at least two hours in an eight-hour workday but *would need a break every 30 minutes*; could sit with normal breaks for about six hours in an eight-hour workday; was limited to "1/3" in the left lower extremity for pushing and pulling; could frequently balance and stoop, occasionally climb and crouch, but could never kneel or crawl.  No manipulative, visual,

communicative, or environmental limitations were found.  (AR 265-271.)[6]

In arriving at a determination with respect to Plaintiff's residual functional capacity, the ALJ gave substantial weight to Dr. Ali's assessment.  According to his decision, he did so because that assessment was "wholly consistent with the weight of the evidence of record and rendered by a physician who is an expert in the evaluation of the medical issues in disability claims under the Social Security Act."  (AR 21).

Dr. Ali was an examining medical consultant.  The physician who issued the June 2, 2005 report did not examine Plaintiff.  To the extent that Dr. Ali's opinion provides support for the ALJ's conclusion that Plaintiff could walk or stand for six hours out of an eight-hour workday, it contradicts the opinion of the non-examining consultant who concluded that Plaintiff would be limited to walking or standing two hours out of an eight-hour workday.

The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician.  *Lester v. Chater*, 81 F.3d at 830.  The uncontradicted opinion of an examining physician may be rejected only if the Commissioner provides clear and convincing reasons for rejecting it.  *Id.*; *Edlund v. Massanari,* 253 F.3d 1152, 1158-1159 (9th Cir. 2001).  An ALJ may reject the opinion of an examining physician and adopt the contradictory opinion of a nonexamining physician only for specific and legitimate reasons that are supported by substantial evidence in the record.  *Moore v. Commissioner of Social Security Administration*, 278 F.3d 920, 925 (9th Cir. 2002) (quoting *Lester v. Chater*, 81 F.3d at pp. 830-831).  Reliance on the opinion of a consulting, examining physician is appropriate, and the opinion of such an expert is substantial evidence where it is based on the expert's own examination and clinical findings.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

///

---

[6]  As noted earlier, a third Physical Residual Functional Capacity Assessment was prepared on September 15, 2005.  (AR 363-372).  It was completed by a non-examining, non-treating medical consultant.  (AR 370).  According to this medical consultant, Plaintiff could lift and carry 20 pounds occasionally and ten pounds frequently; could stand and walk for two out of eight hours, and could sit with normal breaks, for six out of eight hours; and could occasionally climb, balance, stoop, kneel, crouch, and crawl.  No manipulative, visual, communicative, or environmental limitations were found.  (AR 363-372).

Plaintiff cites no legal authority for the proposition that more was required from the ALJ in rejecting the opinion of a non-examining medical consultant in favor of the opinion of an examining consultant in situations where there are no opinions from treating physicians on the specific issue and no contradictory medical opinions from other examining consultants.

What is problematic here, and where the merit of the argument lies, is in the "breaks every 30 minutes while standing and walking" limitation articulated by both Dr. Ali and the State Agency medical consultant.  Nowhere does the ALJ's discussion articulate or even recognize this limitation, and he should have done so.  The need to take breaks every thirty minutes appears to be a significant non-exertional limitation here.  Assuming the ALJ's assignment of the "light work" classification was correct, SSR No. 83-10 notes that "a job is in this category when it requires a good deal of walking or standing."  According to both medical consultants, Plaintiff's impairments would require a break of unknown length every 30 minutes in a job likely to involve a good deal of walking or standing.  See *Tackett v. Apfel*, 180 F.3d at 1103.  While the ALJ need not discuss all evidence presented to him, he must explain why significant probative evidence has been rejected.  *Vincent v. Heckler*, 739 F.2d 1393, 1394-1395(citing *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)).  The ALJ's failure to incorporate or otherwise address this non-exertional limitation in his analysis was improper.[7]

According to the ALJ, as of March 15, 1998, Plaintiff suffered from severe medically determinable impairments that prevented him from doing the work he did in the past.  (AR  22).  Once having reached this conclusion, the burden of proof shifted to the Commissioner to demonstrate that Plaintiff could perform some other work that existed in significant numbers in the national economy, based upon Plaintiff's residual functional capacity, age, education, and work experience.  20 C.F.R. § 416.920(f).

> There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can perform: (a) by the testimony of a vocational expert, or

---

[7] This Court is limited to reviewing the findings of the ALJ and to reviewing the specific facts and reasons that the ALJ asserts.  *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  Moreover, the Court cannot affirm the judgment of an agency on a ground the agency did not invoke in making its decision.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575 (1947).

(b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt, 2, app. 2. [Citation omitted.]
... [¶] The ALJ may rely on the grids alone to show the availability of jobs for the claimant "only when the grids accurately and completely described the claimant's abilities and limitations." [Citations omitted.]" *Tackett*, 180 F.3d at pp. 1100-1101, 1103.

Plaintiff's need to sit or lie down every 30 minutes to relieve the pressure on his knee generated by standing or walking is a significant non-exertional limitation not contemplated by the grids. *Cf. id.* at p. 1103. Therefore, use of the grids was error; the determination of whether Plaintiff was disabled required the opinion of a vocational expert. *Id.* at p. 1104.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not free of legal error. Therefore, the Court orders that:

1. Plaintiff's social security complaint, Doc. 1, IS GRANTED, as set forth above;

2. This matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this opinion, i.e., the testimony from a vocational expert regarding whether and to what extent Plaintiff could perform some other work that existed in significant numbers in the national economy, based upon Plaintiff's residual functional capacity, age, education, and work experience, and the ALJ's reevaluation of his findings on that issue after consideration of such additional evidence; and

3. The Clerk of Court is DIRECTED to ENTER JUDGMENT for Plaintiff Steven L. Seales and against Defendant Michael J. Astrue, Commissioner of Social Security, and to close this file.

IT IS SO ORDERED.

Dated:   **March 24, 2009**                                    **/s/ Theresa A. Goldner**
                                                              UNITED STATES MAGISTRATE JUDGE